UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CASE NO. 5:06-CV-00438-F

| | |
|---|---|
| LOLO FULLER and ) | |
| OXFORD HOUSE, INC., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | ORDER |
| ) | |
| TEACHERS INSURANCE ) | |
| COMPANY, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This matter is before the court upon the Motion to Dismiss [DE-12] by Defendant Teachers Insurance Company ("TIC") pursuant to Federal Rules of Civil Procedure 12(b)(6). Plaintiffs Lolo Fuller ("Fuller") and Oxford House, Inc. ("Oxford") have responded to the motion [DE-16] and TIC has replied [DE-20]. This matter is now ripe for disposition.

## I. STATEMENT OF THE CASE

This case arises out of Defendant's refusal to continue insuring a home owned by Fuller after discovering that Fuller had leased the house as a group home to individuals recovering from drug and alcohol addictions. *See* Compl. [DE-1]. After TIC declined to continue coverage on Plaintiff Fuller's rental property, Plaintiffs Fuller and Oxford filed a complaint on October 25, 2006 alleging claims against TIC and Horace Mann Educators for various violations of the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3601 et seq.

Specifically, Plaintiffs allege TIC's actions constitute unlawful intentional discrimination under 42 U.S.C. §§ 3604(f)(1) and (2), effect a disparate impact on handicapped persons, and fail to grant reasonable accommodation under 42 U.S.C. § 3604(f)(3)(B). *See* Compl. [DE-1]. On December 11, 2006, Defendants TIC and Horace Mann filed a Motion to Dismiss [DE-12]. On January 16, 2007, Plaintiffs filed both a Memorandum in Opposition of Defendants' Motion to Dismiss [DE-16] and a Notice of Voluntary Dismissal of Defendant Horace Mann Educators

[DE-17]. On February 2, 2007, TIC filed a Reply Memorandum [DE-20] in support of its Motion to Dismiss. TIC contends that there are no genuine issues of material fact and that Plaintiff's complaint should be dismissed pursuant to Federal Rules of Civil Procedure 12(b)(6).

## II. STATEMENT OF THE FACTS

Fuller owns a house located at 2600 Firelight Road in Raleigh, North Carolina ("Firelight residence"). From 1972 until 2003, Fuller resided at the Firelight residence and maintained casualty and liability insurance on the premises provided by Horace Mann Educators Corporation, an insurance company and an affiliate of TIC. In December 2003, Fuller purchased another home at 109 Luxorwind Drive in Garner, North Carolina ("Garner residence"). After Fuller purchased the Garner residence, she informed her insurance carrier she would no longer reside at the Firelight residence but instead would rent out the premises. Fuller asked, and the company allegedly agreed, to amend Fuller's insurance policy to reflect this change in usage. In January 2004, Fuller leased the Firelight residence to persons recovering from alcoholism and/or drug addiction who, with the help of Plaintiff Oxford, chartered the home as Oxford-Firelight, a group home for recovering addicts.[1] These persons are not current users of alcohol or illegal drugs. The residents occupy the Oxford-Firelight home in a shared arrangement without supervision and reside together as the "functional equivalent of a family." Compl. ¶ 19 [DE-1].

In April 2006, while investigating damage caused by an attempted burglary, Horace Mann's adjuster discovered that the house was occupied by this group of unrelated persons. The adjuster questioned Fuller and upon learning of her arrangement with Oxford and the tenants, informed Fuller that her policy did not cover "group home[s]." Compl. ¶ 22 [DE-1].

---

[1] Oxford is a non-profit entity first organized in 1975 to assist individuals recovering from alcohol and drug addiction by assisting in the rental of suitable houses for use as group homes.

2

Fuller was then informed via letter dated May 1, 2006 that her insurance would be canceled effective June 3, 2006 due to a "material change in the risk." Compl. ¶ 24 [DE-1]. Thereafter, Fuller learned, despite the previous agreement with her insurance agent, her policy was not amended to reflect the change in the use of the Firelight residence from a primary residence to rental property. Fuller's Horace Mann agent, Charles Maddon, further informed Fuller that no rental policy would be effected for the Firelight residence as long as the house was rented as a "group home," and that Horace Mann would issue rental policies only to those houses being rented by families.

Although Fuller later contacted Horace Mann through an attorney before June 3, 2006 and requested that her policy not be cancelled or, alternatively, that it be reissued in some other form suitable for rental property, her request was denied. Horace Mann again refused to offer any insurance policy as long as the tenants were comprised of a group of persons recovering from alcoholism and/or drug addiction. Fuller's Horace Mann policy was thereafter cancelled on June 3, 2006, causing her to seek a replacement policy from another company both for her Firelight and Garner properties. Fuller claims that as a result of the cancellation of her Horace Mann insurance policy, she has suffered frustration, distress, mental anguish, expenditures of time and resources, and that TIC's actions limit her ability and choices in obtaining insurance, deprive her of her rights to equal housing opportunities, and have resulted in Fuller having a record of cancellation by an insurance company.

Plaintiff Oxford, for its part, alleges that Horace Mann's actions and, by affiliation, those actions of TIC, have thwarted its abilities to provide disabled tenants with the stable environment necessary to the recovery process. Oxford further alleges that the continued discrimination by TIC has interfered with its efforts, contracts, and programs, forced it to devote scarce resources to identify and counteract Horace Mann's unlawful practices, and

3

Case 5:06-cv-00438-F   Document 22   Filed 09/19/07   Page 3 of 11

interfered with the fair housing rights of it and its tenants in violation of the Fair Housing Act of 1968.

### III. STANDARD

TIC has moved to dismiss Plaintiffs' Complaint for failure to state a claim upon which relief may be granted. *See* FED. R. CIV. P. 12(b)(6). In considering a motion to dismiss, a court must construe the complaint liberally in the light most favorable to the plaintiff and assume all the factual allegations of the complaint to be true. *See Conley v. Gibson*, 335 U.S. 41, 45-56 (1994). Nevertheless, a motion to dismiss should be granted if it appears beyond a doubt that the plaintiff can prove no facts that would entitle him to relief. *See id.* Moreover, a court is not bound by legal conclusions asserted by a plaintiff in the complaint.

TIC also has moved for summary judgment on all of Plaintiffs' claims. Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden initially of coming forward and demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When making the summary judgment determination, the facts and all reasonable inferences must be viewed in the light most favorable to the non-moving party. *Liberty Lobby*, 477 U.S. at 255. Once the moving party has met its burden, the non-moving party then must come forward and demonstrate that such a fact issue does indeed exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate against a party who fails to make a showing sufficient to establish any one of the essential elements of the party's claim on which he will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322-23.

## IV. ANALYSIS

TIC seeks dismissal of Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6) arguing that this court is bound by the Fourth Circuit's determination that discriminatory practices by insurance carriers are not precluded by the Fair Housing Act of 1968 ("FHA"). Specifically, TIC relies on the Fourth Circuit's decision in *Mackey v. Nationwide Insurance Companies*, 724 F.2d 419 (4th Cir. 1984), which concludes that the Fair Housing Act "does not proscribe the [] hazard insurance redlining[2] practice." 724 F.2d at 423.

In *Mackey*, the Fourth Circuit observed that the FHA does not explicitly provide whether insurance would be covered by the statute, but instead is silent on the issue. *Id.* The *Mackey* court interpreted the FHA's omission as to insurance practices, as well as the subsequent failed amendments to the FHA to include insurance, as signaling Congress's intent that insurance be precluded as an actionable tenet of the FHA. *Id.* at 433-34 ("Since there is no reference to hazard insurance in the 1968 statute or in its legislative history, the failure of the proposed amendments is supportive of our conclusion that the statute as enacted in 1968 was not intended to reach the hazard insurance industry."). Thus, TIC argues that the *Mackey* court's interpretation of the FHA mandates the dismissal of Plaintiffs' claims.

The construction and interpretation of the FHA did not, however, end with the *Mackey* decision. Were *Mackey* the final word on the FHA's inclusion or preclusion of insurance, this court would be bound by the Fourth Circuit's interpretation of the statute. Since 1984, however, significant events have altered interaction of the FHA with the insurance industry's practices. In 1988, Congress bestowed upon the Department of Housing and Urban Authority ("HUD") rulemaking authority to implement rules to carry out the FHA. *See* 42 U.S.C. § 3614a. Thereafter, in 1989, HUD promulgated rules which included the agency's designation that the scope of the FHA would extend to prohibit discriminatory practices in

---

[2]"Redlining" is a practice through which insurance companies base availability of insurance coverage on the racial makeup of a neighborhood.

providing hazard insurance because of race, color, religion, sex, handicap, familial status, or national origin. *See* 24 C.F.R. 100.70 (d)(4). Thus, HUD's implementation of 24 C.F.R. 100.70 follows a markedly different path than the court in *Mackey*; although the Fourth Circuit's interpretation of the FHA does not extend to cover hazard and casualty insurance within its scope, HUD's regulation does so explicitly. The question, then, is what becomes of the converse interpretations of the FHA in the area of hazard and casualty insurance when a prior judicial interpretation conflicts with a later agency rule?

Fortunately, the Supreme Court answered this very question in *National Cable & Telecommunications Association v. Brand X Internet Services*, 545 U.S. 967 (2005), holding that an agency's interpretation of a statute would trump a prior judicial construction of the same statute unless the court's previous ruling unambiguously foreclosed the agency's interpretation. *Id.* at 983. In order to apply the Supreme Court's ruling in *Brand X*, however, it is important first to review the deference usually afforded an agency when it construes a statute when no prior judicial interpretation exists. In 1984, the Supreme Court ruled that, in the case of an ambiguous statute, an agency's interpretation would be given deference as long as it was reasonable and in accordance with law. *See Chevron, U.S.A., Inc. v. NRDC,* 467 U.S. 837 (1984).

According to the Supreme Court in *Chevron*, there are two steps in determining whether to afford the agency's interpretation deference. Step one asks whether Congress, in the statute's plain terms, "directly spoke[] to the precise question at issue.'" *Chevron*, 467 U.S. at 842. If Congress has not spoken to the direct question, then step two asks whether the agency's interpretation is based on a "permissible construction of the statute." *Id.* at 843. More specifically, unless the agency's actions are "arbitrary, capricious, or manifestly contrary to the statute," the "regulations are given controlling weight." *Id.* Thus, the Court in *Chevron* recognized, even before its ruling in *Brand X*, the possibility that a court's interpretation may differ from an agency's, pointing out that the agency's construction need not be the

6

"only one it permissibly could have adopted . . . or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at n. 11.

Indeed, the Supreme Court noted that, "in such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 844. Thus, the *Chevron* Court made clear that an agency's promulgation would be given deference so long as it was a reasonable interpretation of the statutory ambiguity left open by Congress's silence, even if that promulgation would not parallel the statutory interpretation a court might reach on the same ambiguity.

Although the *Chevron* decision forecasted how conflicting statutory interpretations by a court and a federal agency would be analyzed, the Supreme Court did not directly address how to proceed in such a situation as the instant one until its decision in *Brand X*. The Supreme Court in *Brand X* cleanly outlines the requisite standard for determining which interpretation shall stand when a prior judicial ruling conflicts with a subsequent agency regulation on the same issue. Specifically, the Court stated that "[a] court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Brand X*, 545 U.S. at 838-39. Thus, *Brand X* requires a two prong inquiry in this case. First, whether HUD's promulgations would merit *Chevron* deference even in the absence of a prior conflicting judicial interpretation, and second, whether the prior judicial holding left any room for agency discretion.

TIC argues that HUD's regulations do not merit *Chevron* deference because the regulations are contrary to Congress's explicit statutory intent. The language of the FHA, however, does nothing to enlighten its reader on Congress's intent regarding discriminatory insurance practices, as it is entirely silent on the issue. The Fourth Circuit recognizes that such silence is not evidence of "unambiguously expressed intent" of either assent or prohibition. *Nat'l City Bank of Indiana v. Turnbaugh*, 463 F.3d 325

7

(4th Cir. 2006). Furthermore, the Court in *Chevron* noted that the agency shall be given deference in cases in which the "statute is silent or ambiguous." *Chevron*, 467 U.S. at 843. Thus, there is nothing in the "plain terms" of the statute to indicate Congress's intent as to insurance practices in the FHA. *See Chevron*, 467 U.S. at 482.

TIC also takes the position that the failed FHA amendments to include insurance in the statute must be viewed as clear evidence of Congress's intent that insurance be precluded from the statute. Failed amendments, however, as the Supreme Court has recognized, are "a particularly dangerous ground on which to rest an interpretation of a prior statute." *Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 170 (2001) (citing *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187 (1994)). Therefore, this court declines to make a ruling on Congress's intent based upon the existence of a failed amendment.

Finally, TIC argues that the FHA's legislative history is exemplary of Congress's intent not to include insurance in the statute. TIC, however, relies on statements made by members of Congress during discussions relating to the failed amendments. As the Supreme Court makes clear, "[e]ven when it would otherwise be useful, subsequent legislative history will rarely override a reasonable interpretation of a statute that can be gleaned from its language and legislative history prior to its enactment." *See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 n.13 (1980). Indeed, in *Mackey*, the Fourth Circuit noted the absence of any reference to hazard insurance in the 1968 statute or in the legislative history existing prior to its enactment. *See Mackey*, 724 F.2d at 424. Tus, given the silence of the statute and legislative history on the issue, it appears that the agency's interpretation of the FHA meets the criterion for step one of the *Chevron* analysis.

Step two of the analysis allows for the agency's interpretation to stand as long as it is in accordance with law and neither arbitrary nor capricious. Essentially, the Supreme Court has found that an agency's interpretation will be upheld so long as it was a "reasonable policy choice for the agency to

8

make." *Chevron*, 467 U.S. at 845. Accordingly, given that the purpose of the FHA is to end housing discrimination and to foster " 'truly integrated and balanced living patterns,' " and that Congress expressly allocated rulemaking authority to HUD to carry out these goals, it seems HUD's determination that discriminatory insurance practices should be included in the FHA is entirely reasonable. *See Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 211-12 (1972) (quoting 144 Cong. Rec. 3422 (1968) (explaining the basic purpose of the FHA was to eradicate housing discrimination)).

Both the Sixth and Seventh Circuit Courts of Appeals are in agreement that HUD's regulations should be afforded *Chevron* deference because of the FHA's ambiguity and the agency's reasonable clarification thereof. *See Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351 (6th Cir. 1995); *NAACP v. American Family Mut. Ins. Co.*, 978 F.2d 287 (7th Cir. 1992). Neither the Sixth nor the Seventh Circuit, however, faced the issue in the instant case as there was no prior judicial opinion contrary to the agency's regulations in either circuit. Therefore, the case now before this court also requires an answer to the second prong of the *Brand X* inquiry: whether the Fourth Circuit in *Mackey* left any room for agency discretion. *See Brand X*, 545 U.S. at 985, ("Before a judicial construction of a statute, whether contained in a precedent or not, may trump an agency's, the court must hold that the statute unambiguously requires the court's construction.").

Although TIC is correct in stating that the *Mackey* court employed all the traditional tools of statutory interpretation, and also that the court's interpretation appears entirely reasonable given Congress's silence, it does not appear that the Fourth Circuit "unambiguously foreclose[d] the agency's interpretation" as required by *Brand X* such to trump HUD's subsequent regulations. 545 U.S. at 983. In *Mackey*, the Fourth Circuit relied on three factors to reach its "conclusion that the [FHA] as enacted in 1968 was not intended to reach the hazard insurance industry." *Mackey*, 724 F.2d at 424. The Fourth Circuit pointed to Congress's silence in the FHA, the statute's legislative history, and the failed amendments to include the insurance industry in the statute to support its interpretation that Congress did

9

not intend the statute to prohibit discrimination in insurance agency practices. *Id.* At no point, however, did the Fourth Circuit state that the FHA was unambiguous or clear as to Congress's intent regarding the insurance industry. Rather, the Fourth Circuit used the tools available to the court in 1984 to interpret the silence in the FHA on the issue of insurance practices. The *Mackey* court could not anticipate that in 1988 Congress would allocate to HUD the authority to fill the gaps created by its legislative silence in the FHA. However, where HUD later used that authority to promulgate rules contrary to the Fourth Circuit's interpretation, *Brand X* instructs that the court's prior interpretation must yield to the agency's. *Brand X*, 545 U.S. at 983.

As the *Brand X* Court makes clear, a less stringent standard for determining which interpretation should stand would be contrary to the principles of *Chevron* deference by simply awarding precedence to the statutory interpretation that came first. *Brand X*, 545 U.S. at 983. The Court warns that such a simplistic determination would "'lead to the ossification of large portions of our statutory law.'" *Id.* (citing *United States v. Mead Corp.*, 533 U.S. 218, 247 (2004)). As the Supreme Court explains,

> *Chevron* teaches that a court's opinion as to the best reading of an ambiguous statute an agency is charged with administering is not authoritative, the agency's decision to construe that statute differently from a court does not say that the court's holding was legally wrong. Instead, the agency may, consistent with [*Chevron*], choose a different construction, since the agency remains the authoritative interpreter (within the limits of reason) of such statutes.

*Brand X*, 545 U.S. at 983.[3]

Therefore, *Brand X* instructs that because the Fourth Circuit in *Mackey* did not "unambiguously foreclose[] the possibility of agency discretion," this court must recognize HUD's regulations as controlling on the issue of discrimination by the insurance industry under the FHA. *Id.* HUD's

---

[3] As noted by the Supreme Court in *Brand X*, although understandable confusion exists between the *Chevron* doctrine and *stare decisis* principles, when the agency is afforded deference, the court's prior ruling has not been "'reversed' by the agency, any more than a federal court's interpretation of a State's law can be said to have been 'reversed' by a state court that adopts a conflicting (yet authoritative) interpretation of state law." *Id.* at 983-84.

10

regulations provide that the FHA prohibits discrimination by the insurance industry. Accordingly, it is this court's determination that Plaintiffs' have stated a claim upon which relief may be granted and Defendant's Motion for Dismissal is therefore DENIED.

## V. CONCLUSION

For the foregoing reasons, TIC's Motion to Dismiss [DE-12] is DENIED. The Clerk of Court is DIRECTED to continue the management of this case.

SO ORDERED. This the 19 day of September, 2007.

JAMES C. FOX
Senior United States District Judge